AES:JN
F. #2020R00229

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

KESLER DALMACY,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION
FOR SEARCH WARRANT FOR THE
PREMISES KNOWN AND DESCRIBED
AS THE FIRST FLOOR OF 1671 NEW
YORK AVENUE, BROOKLYN, NEW
YORK 11210, INCLUDING ALL
LOCKED/CLOSED COMPARTMENTS,
SPACES AND CONTAINERS THEREIN
("SUBJECT PREMISES")

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT &
AFFIDAVIT IN
SUPPORT OF
ARREST AND
SEARCH WARRANTS

(21 U.S.C. § 841(a)(1))

21-M-246

EASTERN DISTRICT OF NEW YORK, SS:

        Rushang Patel, being duly sworn, deposes and states that he is a Special Agent

with the Drug Enforcement Administration, duly appointed according to law and acting as

such.

        On or about and between January 2014 and February 2020, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendant KESLER DALMACY did knowingly and intentionally, and without authorization,

distribute controlled substances, which offense involved substances containing Adderall and

Vicodin, both Schedule II controlled substances, Tylenol with Codeine, a Schedule III controlled substance, and Tramadol, a Schedule IV controlled substance.

(Title 21, United States Code, Section 841(a)(1))

The source of your affiant's information and the grounds for his belief are as follows:[1]

1.      I have been a Special Agent with the Drug Enforcement Administration ("DEA") since August 2015.   During my tenure with the DEA, I have been involved in the investigation of numerous cases involving the illegal distribution of controlled substances by medical professionals outside the usual course of professional practice and not for a legitimate medical purpose.   I am familiar with the facts and circumstances set forth below from my participation in the investigation, my review of the investigative file and from reports of other law enforcement officers involved in the investigation.

2.      I am participating in an investigation of the defendant KESLER DALMACY, who is a practicing medical doctor.   DALMACY specializes in family medicine, public health and general preventative medicine, and is a pathologist.   From at least in or about 2013 until present, DALMACY operated his medical practice out of the SUBJECT PREMISES located on the first floor of 1671 New York Avenue, Brooklyn, New York, 11210, further described in Attachment A.

---

[1] Because the purpose of this Complaint and Search Warrant is to set forth only those facts necessary to establish probable cause to arrest and conduct a search warrant of the SUBJECT PREMISES, I have not described all the relevant facts and circumstances of which I am aware.

3.      This investigation revealed that the defendant KESLER DALMACY illegally distributed prescriptions for Schedules II, III and IV controlled substances outside the usual course of professional practice and not for a legitimate medical purpose.

4.      Based on the facts set forth in this affidavit, I submit that there is probable cause to arrest the defendant KESLER DALMACY for violation of 21 U.S.C. § 841(a)(1) and to search the SUBJECT PREMISES as further described in Attachment A for evidence, instrumentalities, contraband and fruits of this and other crimes (collectively, the "Target Offenses") as further described in Attachment B.

## RELEVANT BACKGROUND

5.      The Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801 et seq., and regulations promulgated thereunder, classify controlled substances in five schedules. Schedule I controlled substances, including, for example, heroin and LSD, do not have an acceptable medical use in the United States.   Schedule II through Schedule V controlled substances have acceptable medical uses, but their use is restricted according to the potential for abuse.   The medical use of Schedule II controlled substances, including Adderall and Vicodin, is severely restricted because such drugs have a high abuse potential, while Schedule III controlled substances have an abuse potential less than those in Schedule II, followed by Schedule IV and Schedule V.   Schedule V controlled substances consist primarily of preparations containing limited quantities of certain narcotics and stimulant drugs.

6.      Pursuant to Title 21 C.F.R. §§ 1306.11(a) and 1306.21(a), a controlled substance listed in Schedules II, III, IV or V that is a prescription drug, as determined under the Food, Drug & Cosmetics Act, 21 U.S.C. §§ 301 et seq., may be dispensed only if

prescribed by an authorized practitioner.   Schedule II controlled substances require a written prescription which must be manually signed by the practitioner or an electronic prescription that meets all DEA requirements for electronic prescriptions for controlled substances.

7.     The CSA scheduling system is supplemented by the individual states according to local needs and conditions.   In New York State, a physician must prescribe Schedule II drugs via an official New York State prescription.   Information concerning transactions involving Schedule II drugs is transmitted to state authorities via computer when the drugs are dispensed by a pharmacist.

8.     In addition to the requirements imposed by New York State, physicians must obtain and maintain a registration with the DEA authorizing them to prescribe all controlled substances, in Schedules in which they are registered, pursuant to 21 C.F.R. § 1306.03.

9.     Title 21, C.F.R. § 1306.04(a) sets forth the purpose of the issuance of a prescription.   It says, in pertinent part, in order for "[a] prescription for a controlled substance to be effective, [it] must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.   The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner . . . [a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of section 309 of the Act (21 U.S.C. § 829) and . . . the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

10.     Schedule II controlled substance prescriptions are reported and electronically maintained at the New York State, Department of Health, Bureau of Narcotic

Enforcement ("BNE").   The disclosure of prescription records caused by the execution of a search warrant is not prohibited by the regulations promulgated under the Health Insurance Portability and Accountability Act of 1996, commonly referred to as "HIPAA," P.L. 104-191, which permit the disclosure of medical records pursuant to a court-ordered warrant. See 45 C.F.R. § 164.512(f)(1)(ii)(A).

11.     Written prescriptions by physicians are written on what is commonly referred to as a "prescription pad."   A doctor licensed by the State of New York and registered by the DEA to write controlled substance prescriptions may order pre-printed prescription pads from New York State.   Each pad contains 100 prescriptions with a serial number, the doctor's name, a bar code, the doctor's license number and the address used by the doctor on his or her DEA registration and his or her registration number.   The doctor issuing the prescription must fill in, among other things, the patient's full name and address, the drug name, strength, dosage form, quantity dispensed and directions for use.   The New York State Department of Health has mandated that all prescriptions be filed electronically via Electronic Prescribing, commonly referred to as "e-scribing", unless a doctor has been granted a waiver for a limited list of reasons, for a limited period of time.   This mandate has been in effect since approximately March 27, 2016.

## PROBABLE CAUSE

12.     To date, the investigation into the defendant KESLER DALMACY has established probable cause to believe that DALMACY is engaged in the unlawful distribution of substances containing Adderall and Vicodin, both Schedule II controlled substances, Tylenol with Codeine, a Schedule III controlled substance, and Tramadol, a

Schedule IV controlled substance, all in violation of 21 U.S.C. § 841(a), from the SUBJECT

PREMISES.

I.      Jane Doe #1

13.     Jane Doe #1, an individual whose identity is known to your affiant, was

a patient of the defendant KESLER DALMACY from approximately 2014 to 2019.   Jane

Doe #1 reported to law enforcement that after she became addicted to prescription pain

medication, she was referred to DALMACY by her mother, who told Jane Doe #1 that

DALMACY would supply Jane Doe #1 with whatever prescription medications she

requested.[2]

14.     During her initial visit with the defendant KESLER DALMACY at the

SUBJECT PREMISES in 2014, in response to his questions, Jane Doe #1 informed

DALMACY that she was taking Tramadol for pain due to a recent surgery, which was

untrue.   In response, DALMACY issued a prescription for Tramadol and charged Jane Doe

#1 in cash for the prescription.   DALMACY did not ask Jane Doe #1 any questions about

her surgery or seek medical records regarding the same, did not physically examine her or

take her vital signs, did not seek any other information and did not make any recording in a

---

[2] Jane Doe #1 was arrested on March 12, 2019 in the City of Virginia Beach, Virginia for obtaining drugs by fraud, in violation of Virginia State Code § 18.2-258.1.   Her arrest occurred after she tried to fill a number of different prescriptions at different pharmacies for Tylenol with Codeine under several aliases; all the prescriptions were issued by the defendant KESLER DALMACY.   Jane Doe #1's case was dismissed after it was placed on a deferred finding due to good behavior for a period of one year, and was based in part on her continued cooperation in the instant case.

manual or electronic patient record.   Jane Doe #1 recalled that the visit lasted at most two minutes.

15.     Thereafter, Jane Doe #1 made additional visits to the defendant KESLER DALMACY at the SUBJECT PREMISES, during which DALMACY began prescribing Jane Doe #1 Tylenol with Codeine.   Over time, Jane Doe #1 began to see DALMACY several times per month because she was taking the pain killers DALMACY prescribed so frequently.[3]   At that point, DALMACY knew which prescriptions Jane Doe #1 was seeking and would simply write out those prescriptions as soon as she arrived in his office.   According to Jane Doe #1, her visits with DALMACY never lasted more than a few minutes.

16.     At some point, the defendant KESLER DALMACY stated that Jane Doe #1 was asking for prescriptions too frequently.   To continue issuing prescriptions to Jane Doe #1, but to avoid suspicion, DALMACY suggested that Jane Doe #1 provide him with a different name so he could issue prescriptions to Jane Doe #1 in a different name from her own.   DALMACY directed Jane Doe #1 to provide him with a different first name but keep the last name the same.[4]   During most visits, DALMACY continued to charge Jane Doe #1 in cash for writing prescriptions.

---

[3] At the height of her addiction and while being treated by the defendant KESLER DALMACY, Jane Doe #1 was taking approximately 14 prescription pain killers every four to six hours, which caused her to run out of pain medication every week.

[4] Over time, Jane Doe #1 filled prescriptions issued by the defendant KESLER DALMACY in the names of fictitious individuals; in the name of Jane Doe #1's sister, whom never visited DALMACY; in the name of Jane Doe #1's other sister, who had previously visited DALMACY, and in the name of Jane Doe #1's grandmother, who similarly never visited DALMACY.

17.     In or about and between January 2016 and February 2019, Jane Doe #1 obtained the following controlled substances from the defendant KESLER DALMACY:

a.     approximately 3,840 tablets of Tylenol with Codeine (300mg/30mg), a Schedule III controlled substance;

b.     approximately 3,228 tablets of Tramadol (50mg), a Schedule IV controlled substance; and

c.     approximately 60 tablets of Alprazolam (1mg), also known as Xanax, a Schedule IV Benzodiazepine controlled substance.

18.     During this time period, Jane Doe #1 also observed other patients enter and leave the defendant KESLER DALMACY's examination room after short periods of time with prescriptions in hand.

II.     The Undercover

19.     Two detectives with the New York City Police Department ("NYPD") working in an undercover capacity ("UC-1" and "UC-2", collectively the "UCs")[5] visited the defendant KESLER DALMACY at the SUBJECT PREMISES six times collectively in about and between September 2019 and February 2020.[6]   During UC-1's visits with

---

[5] On or about the early morning hours of November 11, 2020, UC-1 was the victim of a carjacking while off duty.   UC-1 had a gun pointed at him/her by the assailant and fired back at the assailant in self-defense.   As a result, NYPD placed UC-1 on administrative leave.   The government has consulted with the NYPD and it is the government's understanding that UC-1 will not be criminally charged, however, the incident is still being investigated by the NYPD.

[6] Nearly all of the below-described office visits made by the UCs to the defendant KESLER DALMACY at the SUBJECT PREMISES were recorded on video or audio.

DALMACY, DALMACY prescribed Tramadol, Vicodin, Adderall and Tylenol with Codeine.

20.     On or about September 6, 2019, UC-1 attended an office visit with the defendant KESLER DALMACY at the SUBJECT PREMISES.[7]   UC-1 observed a receptionist at the front desk of the waiting area and an appointment book used by patients to fill out patient information and provide a reason for the visit.   While in the waiting area at the SUBJECT PREMISES, UC-1 spoke to an unidentified mail patient ("UM"), who reported that he was told about DALMACY by a friend, who reported that DALMACY would write the UM a prescription if he complained of back pain.   During the office visit with DALMACY, UC-1 complained of back discomfort and requested that DALMACY prescribe him Oxycodone or Percocet.   DALMACY stated that he would not prescribe Oxycodone because he did not want to lose his license and noted that a lot of his younger patients had asked him to prescribe Oxycodone.   As a result, DALMACY stated that he had to cut back on writing Oxycodone prescriptions.   During this visit, DALMACY's examination of UC-1 consisted only of lifting up UC-1's shirt and looking at his back. DALMACY then wrote UC-1 a prescription for 60 tablets of Tramadol (50mg). DALMACY requested $60 in cash for the prescription but agreed to accept $50 at UC-1's request.

21.     On or about October 17, 2019, UC-1 again attended an office visit with the defendant KESLER DALMACY at the SUBJECT PREMISES, during which

---

DALMACY spoke to UC-1 in Haitian Creole during the visits.   The descriptions below rely, in part, on draft translations of the recordings.

[7] Your affiant has reviewed an audio recording of this visit.

DALMACY provided UC-1 with two prescriptions for Tylenol with Codeine (60 tablets for each prescription), one in UC-1's undercover name and the other in a fictitious identity provided by UC-1.[8]   During this visit, which lasted approximately seven minutes, UC-1 did not discuss any medical condition with DALMACY and DALMACY did not perform a medical evaluation.   At first, DALMACY provided UC-1 with only one prescription for Tylenol with Codeine in UC-1's undercover name.   When UC-1 asked for an additional prescription, DALMACY requested that UC-1 provide him with another name for the second prescription.   DALMACY also postdated the second prescription to October 18, 2019.   At DALMACY's request, UC-1 paid DALMACY a total of $100 dollars in cash for the two prescriptions.   During the visit, UC-1 again asked DALMACY to prescribe Oxycodone, to which DALMACY responded that he could not write the prescription because too many people were asking for Oxycodone prescriptions.   However, DALMACY directed UC-1 to see another doctor in Brooklyn who DALMACY thought could write the prescription. DALMACY also offered to provide UC-1 with Adderall before agreeing to prescribe the Tylenol with Codeine.

22.     On or about November 7, 2019, UC-2 attended an office visit with the defendant KESLER DALMACY at the SUBJECT PREMISES, during which DALMACY provided UC-2 with a prescription for Gabapentin (300mg), a nerve pain medication, and a prescription for Voltaren Gel (60g), a topical pain relief gel.[9]   Neither is a controlled substance.

---

[8] Your affiant has reviewed a video recording and draft transcript for this visit.

[9] It is your affiant's understanding that due to a technology failure, UC-2's visit was not recorded.

23.     On or about December 4, 2019, UC-1 again went to see the defendant KESLER DALMACY at the SUBJECT PREMISES, and during this visit obtained prescriptions for Adderall (20mg) and Vicodin (7.5/300mg).[10]   During this visit, UC-1 sat in the waiting room of the SUBJECT PREMISES for approximately one hour, at which point he approached the receptionist (the "Receptionist"), an individual whose identity is known to your affiant, and indicated that he simply needed a prescription and could not wait any longer.   At this point, the Receptionist asked UC-1 to place money in an envelope.   UC-1 placed $200 in cash into the envelope provided by the Receptionist.   The Receptionist then provided UC-1 with a piece of paper and requested that UC-1 write down what prescriptions he/she needed.   UC-1 wrote that he/she needed Percocet.   The Receptionist told UC-1 that she would bring the envelope and the piece of paper requesting Percocet to DALMACY. When the Receptionist returned, she told UC-1 that DALMACY did not want to issue Percocet and wanted to see UC-1 in light of his/her request.   UC-1 then had an approximately eight-minute visit with DALMACY, during which DALMACY made a phone call and issued UC-1 a prescription for Adderall.   UC-1 told DALMACY that he had an additional $100 in cash on hand and requested a prescription for Vicodin.   UC-1 provided a fictitious name along with a fictitious address, and DALMACY provided the prescription in that name.   During the visit, UC-1 did not discuss any medical condition with DALMACY, nor did DALMACY examine UC-1.

---

[10] Your affiant has reviewed a video recording and draft transcript of this visit.

24.     On or about January 22, 2020, UC-1 again went to see the defendant KESLER DALMACY at the SUBJECT PREMISES.[11]   During this visit, UC-1 obtained two prescriptions for 30 tablets each of Adderall (30mg).   While in the waiting room, UC-1 asked the Receptionist if UC-1 could place money in an envelope and write down which prescriptions UC-1 wanted.   The Receptionist provided UC-1 with an envelope, in which UC-1 placed $200.   On a piece of paper, UC-1 wrote down UC-1's assumed identity and a fictitious name with two different addresses and the word "Adderall."   The Receptionist brought the envelope to DALMACY.   The Receptionist then informed UC-1 that DALMACY wanted to see UC-1.   While UC-1 spent only approximately five minutes with DALMACY and no medical evaluation was performed during the visit, DALMACY told UC-1 that his/her medical prescription requests required UC-1 to see DALMACY in person. During the visit, DALMACY instructed UC-1 to fill the two prescriptions at two different pharmacies.

25.     On or about February 21, 2020, UC-1 again went to see the defendant KESLER DALMACY at the SUBJECT PREMISES.[12]   During this visit UC-1 obtained two prescriptions for 60 tablets each of Adderall (20mg).   Upon entering the SUBJECT PREMISES, UC-1 asked the Receptionist for an envelope.   UC-1 then placed approximately $200 in cash into the envelope and wrote "Adderall" along with UC-1's assumed identity and a second fictitious name on a piece of paper affixed to the envelope, and handed the envelope to the Receptionist.   The Receptionist brought the envelope back to DALMACY and UC-1

---

[11]   It is your affiant's understanding that due to a technology failure, the video recording of this visit ends before the events described in this paragraph.

[12]   Your affiant has reviewed a video recording and draft transcript of this visit.

was called in to see DALMACY shortly thereafter.   DALMACY spent approximately four minutes with UC-1 and did not examine UC-1 or ask any questions about why UC-1 needed the medication.   DALMACY provided UC-1 the two Adderall prescriptions in the two fictitious names provided by UC-1.

III.    Additional Investigation

26.    An analysis of the defendant KESLER DALMACY's prescription history confirms UC-1's report that DALMACY postdated prescriptions and provided numerous identical prescriptions to individuals under multiple names.   The following are examples of DALMACY postdating prescriptions.

a.    Example 1:   On DALMACY's prescription pad bearing serial number #0TMJQQ, prescription numbers 05 through 08 were issued to patients under four different names.   Each patient was prescribed the same medication:   90 tablets of Oxycodone (30mg).   Prescription numbers 05 and 06 were dated July 20, 2019; prescription numbers 07 and 08 were dated July 21, 2019.   However, prescription number 09 was again dated July 20, 2019, indicating that prescription numbers 07 and 08 were postdated.   The four prescriptions numbered 05 through 08 were all filled on July 22, 2019 at the same pharmacy in Brooklyn with successive Rx numbers, suggesting that they were filled at the same time.

b.    Example 2:   On DALMACY's prescription pad bearing serial number #0TMJQV, prescription numbers 66, 67, 68 and 70 were issued to patients under four different names.   Each patient was prescribed the same medication:   90 tablets of Oxycodone (30mg).   Prescription number 66 was dated September 20, 2019; prescription number 67 was dated September 21, 2019; prescription number 68 was dated September 22,

2019; and prescription number 70 was dated September 23, 2019.   However, prescription

number 71 was again dated September 20, 2019, indicating that prescription numbers 67, 68

and 70 were postdated.   The four prescriptions numbered 66 through 70 were all filled on

September 23, 2019 at the same pharmacy in Brooklyn with successive Rx numbers,

suggesting that they were filled at the same time.

27.    Additional analysis conducted using prescription fill history data

received from the BNE for the period January 1, 2016 through December 31, 2019 has

revealed that at least 14 patients who received Oxycodone prescriptions from the defendant

KESLER DALMACY received those prescriptions under fictitious identities.   The names of

the patients on the subject Oxycodone prescriptions were searched through multiple public

source platforms, which yielded no results.

28.    On January 13, 2021, January 29, 2021, and February 4, 2021, the

defendant KESLER DALMACY submitted requests to the DEA to voluntarily retire his

DEA registration.   In response, on February 5, 2021, a DEA Diversion Investigator and

Special Agent went to the SUBJECT PREMISES and spoke to DALMACY.[13]   DALMACY

stated, in sum and substance, that he submitted his request due to pressure from patients to

issue pain medication prescriptions.   DALMACY also admitted that he was aware that some

of his patients were lying to him about their need for pain medication and that he believed

that they would sell the pain medication that he prescribed.   DALMACY asked whether it

---

[13]  During the February 5, 2021 visit, the Diversion Investigator observed a sign in the waiting room of the SUBJECT PREMISES stating the following: "Important Notice! Narcotic Prescriptions including: Oxycodone, Percocet, Xanax, Adderall, Tylenol, Codeine and all other equivalent substances will not be dispensed at this office.   Until Further Notice!"

was possible to keep certain prescribing privileges and not others, and ultimately stated that

he wanted to rescind his request to retire his registration.

## THE SUBJECT PREMISES

29.     The SUBJECT PREMISES is located on the first floor of 1671 New

York Avenue, Brooklyn, New York 11210.   The SUBJECT PREMISES is located in a

residential-type building with steps leading up to a porch area and a front door.   There is a

sign above the porch that reads "DOCTORS OFFICE."   Upon entry, there is a small hallway

that leads to a second door into the main office.   Inside, there is an enclosed reception area

to the right, and past the reception area to the right is a waiting area.   Within the reception

area, there are file cabinets bearing alphabetic letters consistent with medical record filing

and a computer.   Past the reception area to the left in the rear is the defendant KESLER

DALMACY's office, which contains an examination table and DALMACY's desk.

Photographs of the exterior of the SUBJECT PREMISES are annexed hereto in

Attachment A.

30.     The SUBJECT PREMISES served as the defendant KESLER

DALMACY's principal place of business.   DALMACY is registered with the DEA to

prescribe controlled substances under number AD2238601 and is registered in New York

State under license number 155589.

31.     As noted above, the defendant KESLER DALMACY prescribed Jane

Doe #1 and UC-1 substances on Schedules II, III and IV without an examination and under

fictitious names during visits at the SUBJECT PREMISES.

32.     Based on my training and experience and participation in investigations

involving the illegal prescription of controlled substances, I know that medical providers,

such as the defendant KESLER DALMACY, prepare, maintain and keep medical records for the patients to whom prescriptions are written.   Such providers often keep physical evidence, fruits and instrumentalities of their crimes inside their offices, including:   both falsified and accurate medical records for patients; medical billing records; documents identifying the procedures, if any, that were actually performed on their patients; and ledgers or other records recording payments made or received relating to the sale and distribution of controlled substances.

33.     I have also learned through my training and experience that doctors who illegally prescribe controlled substances will often falsify patient files to give the appearance that an evaluation was done of the patient, even when that was not the case. Here, as described above, evidence established that the defendant KESLER DALMACY repeatedly issued prescriptions for patients who did not receive medical examinations and in fictitious names.   I therefore have probable cause to believe that DALMACY falsified medical files for these patients and other individuals to whom he was illegally prescribing controlled substances.

34.     Additionally, I have learned through my training, education and experience that such evidence, fruits and instrumentalities are often stored in locked containers, safes, secret compartments, closets, drawers, above or below ceiling and floor tiles, behind false walls and, when digital in nature, inside locked or lockable electronic devices (e.g., computers and smart telephones) and in other places intended to avoid detection by other people, including law enforcement.   I know that reviewing medical files and other records kept by medical practitioners engaging in such conduct will often reveal

patterns and repetitions of behavior (i.e., identical treatment notes, pre-filled forms) and other indicia of fraudulent and illegal activity.

35.     Additionally, individuals who unlawfully dispense and traffic in controlled substances, including doctors who improperly prescribe prescription drugs, often keep computers and computer-related equipment in their business locations and utilize the equipment to keep detailed records of their controlled substance transactions.   Various computer software programs originally designed for balancing home finances are often utilized by such individuals to keep track of drug profits earned through illicit narcotics dispensing.   Records and documents and computers containing such information frequently are maintained in these locations on a continuing basis and for long periods.   During this investigation, and as discussed above, we have also learned that there is at least one computer in the reception area of the SUBJECT PREMISES.

36.     Notably, the disclosure of prescription records which would be caused by the execution of a search warrant is not prohibited by the regulations promulgated under HIPAA, which permits the disclosure of medical records pursuant to a court-ordered warrant. See 45 C.F.R. § 164.512(f)(1)(ii)(A).

I.     Technical Terms

37.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.     *IP Address*: The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.   An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).   Every computer attached to the Internet must be assigned an IP address so

that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.   Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

          b.    *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other.   Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

          c.    *Storage medium*: A storage medium is any physical object upon which computer data can be recorded.   Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

II.      Computers, Electronic Storage, and Forensic Analysis

        38.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found.   One form in which the records might be found is data stored on a computer's hard drive or other storage media.   Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

        39.    *Probable cause.*   I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

          a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they

have been downloaded onto a storage medium, deleted, or viewed via the Internet.

Electronic files downloaded to a storage medium can be stored for years at little or no cost.

Even when files have been deleted, they can be recovered months or years later using

forensic tools.   This is so because when a person "deletes" a file on a computer, the data

contained in the file does not actually disappear; rather, that data remains on the storage

medium until it is overwritten by new data.

        b.     Therefore, deleted files, or remnants of deleted files, may reside

in free space or slack space—that is, in space on the storage medium that is not currently

being used by an active file—for long periods of time before they are overwritten.   In

addition, a computer's operating system may also keep a record of deleted data in a "swap"

or "recovery" file.

        c.     Wholly apart from user-generated files, computer storage

media—in particular, computers' internal hard drives—contain electronic evidence of how a

computer has been used, what it has been used for, and who has used it.   To give a few

examples, this forensic evidence can take the form of operating system configurations,

artifacts from operating system or application operation, file system data structures, and

virtual memory "swap" or paging files.   Computer users typically do not erase or delete this

evidence, because special software is typically required for that task.   However, it is

technically possible to delete this information.

        d.     Similarly, files that have been viewed via the Internet are

sometimes automatically downloaded into a temporary Internet directory or "cache."

        e.     Based on actual inspection of other evidence related to this

investigation, including the BNE data described above, I am aware that computer equipment

was used to generate, store, and print documents used in the drug trafficking scheme under investigation.   There is reason to believe that there is a computer system currently located on the SUBJECT PREMISES.

40.   *Forensic evidence.*   As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the Target Offenses, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.   There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).   Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.   Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.   Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States

to establish and prove each element or alternatively, to exclude the innocent from further suspicion.   In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.   This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.   The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.   Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.   For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.   Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.   Such file data typically also contains information indicating when the file or image was created.   The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated

camera).   The geographic and timeline information described herein may either inculpate or exculpate the computer user.   Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.   For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.   While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.   Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.   For example, the presence or absence

of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

41.     *Necessity of seizing or copying entire computers or storage media.*   In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant.   In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.   Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.   This is true because of the following:

a.     The time required for an examination.   As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.   Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.   Storage media can store a large volume of information.   Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.     Technical requirements.   Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.   Therefore, searching them sometimes requires tools or

knowledge that might not be present on the search site.   The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the SUBJECT PREMISES. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

        c.     Variety of forms of electronic media.   Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

        42.     *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.   The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

        43.     The medical office maintained by the defendant KESLER DALMACY (i.e., the SUBJECT PREMISES) (the "Company") is a functioning company that may conduct legitimate business.   The seizure of the Company's computers may limit the Company's ability to conduct its legitimate business.   As with any search warrant, I expect that this warrant will be executed reasonably.   Reasonable execution will likely involve conducting an investigation on the scene of what computers, or storage media, must be seized or copied, and what computers or storage media need not be seized or copied.   Where

appropriate, officers will copy data, rather than physically seize computers, to reduce the extent of disruption.   If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Company's legitimate business.   If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it.

## CONCLUSION

WHEREFORE, your affiant respectfully requests that the defendant KESLER DALMACY be dealt with according to law; and

WHEREFORE, your affiant respectfully submits that this affidavit supports probable cause for a warrant to search the SUBJECT PREMISES described in Attachment A and to seize the items described in Attachment B.

## REQUEST FOR SEALING

It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the instant complaint and affidavit and related arrest and search warrants.   The defendant is currently at liberty, and it is respectfully submitted that sealing these documents is necessary to prevent the defendant from learning that a complaint has been filed and an arrest warrant issued, and to thus prevent the defendant from avoiding arrest and prosecution.   It is further respectfully submitted that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time.   Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and

search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.   Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Rushang Patel
Special Agent, Drug Enforcement Administration

Sworn to before me this
__ day of February, 2021

VY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

*Property to be searched*

The property to be searched is the first floor of 1671 New York Avenue, Brooklyn, New York 11210, including all locked and closed compartments, containers and spaces therein (the "SUBJECT PREMISES").   The SUBJECT PREMISES is located on the corner of New York Avenue and Avenue H in Kings County, within the Eastern District of New York.   The SUBJECT PREMISES is located in a residential-type building with steps leading up to a porch area and a front door.   There is a sign above the porch that reads "DOCTORS OFFICE."   The exterior of the SUBJECT PREMISES is depicted in two (2) photographs below.





## ATTACHMENT B

*Property to be seized*

1.      All instrumentalities, evidence, and fruits of violations of 21 U.S.C. §§ 841(a)
(narcotics trafficking), 843(a) (aiding and abetting the unlawful acquisition of controlled
substances) and 846 (narcotics trafficking conspiracy), and 18 U.S.C. §§ 1956 and 1957
(money laundering) concerning the defendant KESLER DALMACY, and others working in
concert with him, from in or about January 2014 through in or about the present, including:

     a.   documents, information or records, in whatever form, relating to Schedule II
through Schedule V controlled substances ordered, purchased, received,
stored, sold, distributed or dispensed, including, but not limited to, paper and
electronic prescriptions, pill containers, pharmacy bottles, medicine bottles,
and books, records, receipts, notes, ledgers and other papers relating to the
prescription, transportation, ordering, sale, purchasing and distribution of
controlled substances;

     b.   books, records, invoices, receipts, billing records, intake sheets, patient files,
insurance records, insurance authorization forms, records of prescriptions
dispensed, records of medical treatments and tests, MRIs, x-rays, urinalysis
tests, office policies and office management records; correspondence with
pharmacies, insurance companies or other medical practitioners related to
patients; and notes and correspondence related to medical billing, equipment
and treatment;

     c.   documents, information or records, in whatever form, to patient lists and
related identifying information, for patients who have received controlled
substances;

     d.   billing and payment records, including, but not limited to, receipts of
payments, checks, checkbooks, credit card records, invoices, shipping
documentation, insurance records, bank statements, tax records, bills, cash
receipt books and bookkeeping ledgers for customers who have received
controlled substances;

     e.   U.S. and foreign or digital currency that may constitute the proceeds of drug
distribution, and records relating to the disposition of drug proceeds or other
location of where drug proceeds may be stored or secreted, including keys to
safe deposit boxes or storage facilities;

    f.    any and all records relating to claims for reimbursement and/or the billing and payment for controlled substances;

    g.    computers and storage media which could contain or be used to transmit or store any records, documents and materials described in (a) through (f) above.

2.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (collectively, "Computer"):

    a.    evidence of who used, owned, or controlled the Computer at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.    evidence of software that would allow others to control the Computer, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.    evidence of the lack of such malicious software;

    d.    evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    e.    evidence indicating the computer user's state of mind as it relates to the crime under investigation;

    f.    evidence of the attachment to the Computer of other storage devices or similar containers for electronic evidence;

    g.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Computer;

    h.    evidence of the times the Computer was used;

    i.    passwords, encryption keys, and other access devices that may be necessary to access the Computer;

    j.    documentation and manuals that may be necessary to access the Computer or to conduct a forensic examination of the Computer;

    k.    records of or information about Internet Protocol addresses used by the Computer;

l.   records of or information about the Computer's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.   contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.   Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.